James L. Hiller, OSB #772220
Hitt Hiller Monfils Williams LLP
411 SW 2nd Avenue, Suite 400
Portland, Oregon 97204
Telephone 503.228.5973
Telefax 503.228.4250
jhiller@hittandhiller.com

Jon D. Robinson
Bolen, Robinson & Ellis, LLP
202 South Franklin Street, 2nd Floor
Decatur, IL  62523
Telephone 217.429.4296
Telefax 217.329.0034
jrobinson@brelaw.com
(*Pro hac vice* admission pending)

Richard A. Ramler
Ramler Law Office, P.C.
202 West Madison Ave.
Belgrade, MT  59714
Telephone 406.388.0150
Telefax 406.388.6842
rramler@ramlerlaw.com
(*Pro hac vice* admission pending)

Attorneys for Petitioners

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **TERI SEE** and **DARREL SEE**,<br><br>Petitioners ,<br><br>vs.<br><br>Remington Arms Company, Inc., now known as,  **SPORTING GOODS PROPERTIES, INC.**, A Delaware Corporation<br><br>Defendants. | No. _____ 3:13-cv-01765-BR<br><br><br><br>**PETITION FOR RELIEF FROM JUDGMENT TO REMEDY FRAUD ON THE COURT** |

PETITION FOR RELIEF FROM JUDGMENT                                    Page 1

NOW COME the petitioners, TERI SEE and DARREL SEE, by and through their attorneys, HITT HILLER MONFILS WILLIAMS, LLP, BOLEN, ROBINSON & ELLIS, LLP, and RAMLER LAW OFFICE, P.C., and file this petition as an independent action for relief from judgment to remedy fraud on the court pursuant to Federal Rule of Civil Procedure 60(d) and in support thereof state as follows:

## PARTIES

1.      Petitioners, Teri See and Darrel See, are individuals who, at all material times, resided within Clatsop County, Oregon and were citizens of the state of Oregon.  They were both original parties to *See v. Remington Arms Co., Inc.* Civil No. 81-886 (Dist. Or., filed Sep. 22, 1981) as Plaintiffs.

2.      Remington Arms Company, Inc. was an original party to *See v. Remington Arms Co., Inc.* Civil No. 81-886 (Dist. Or., filed Sep. 22, 1981).

3.      Sporting Goods Properties, Inc. is a Delaware corporation with its headquarters/principal place of business in Wilmington, Delaware. (Sporting Goods Properties, Inc. is named here because it is successor to Remington Arms Company, Inc., or intertwined per paragraph 8 below.)

4.      Since *See v. Remington Arms Co., Inc.* was decided, there have been multiple changes in the corporate structure of Defendant Remington Arms Company, Inc. n/k/a Sporting Goods Properties, Inc.

5.      Remington Arms Company, Inc. n/k/a Sporting Goods Properties, Inc., was, and is now engaged in the business of designing, manufacturing, assembling, distributing and selling firearms, and in this regard did design, manufacture, distribute, sell and, place into the stream of commerce, the Remington Model 700 Bolt Action Rifle that was the subject of *See v. Remington*

PETITION FOR RELIEF FROM JUDGMENT                                    Page 2

*Arms Co., Inc.* including the action, safety and fire control system knowing and expecting that said Rifles would be used by consumers and around members of the general public.

6.      Prior to November 30, 1993, E.I. du Pont de Nemours & Company ("DuPont") owned 100% of the stock in the company known as Remington Arms Company, Inc., now known as Sporting Goods Properties, Inc.  On or about November 30, 1993, Remington Arms Acquisition Corporation, Inc. ("RACI") purchased from DuPont substantially all of the income producing assets of Remington Arms Company, Inc. (now known as Sporting Goods Properties, Inc), including the corporate name. The company formerly known as Remington Arms Company, Inc. changed its name to Sporting Goods Properties, Inc., and RACI changed its name to Remington Arms Company, Inc.  Sporting Goods Properties, Inc. retained certain non-income producing assets, some with significant environmental and other liabilities such that its net worth was reduced to a small fraction of its former so that Sporting Goods Properties, Inc may not be able to pay reasonable judgments in this and similar litigation.

7.      Remington Arms Company, Inc. and Sporting Goods Properties, Inc. are so intertwined contractually for the liabilities, past, present and future, of each other that they are, in fact, one entity and therefore, the corporate veils of each company should be pierced to properly ascertain the responsible parties for the allegations contained herein. The Asset Sale/Purchase Agreement transferring the assets of Sporting Goods Properties, Inc. (hereafter referred to as "Remington") to Remington Arms Company, Inc. and various revised or supplemental agreements spreads responsibility and authority for product liability claims among the two entities, and it is unclear who bears the contractual liability for the claims alleged herein.

/ / /

/ / /

PETITION FOR RELIEF FROM JUDGMENT                                                            Page 3

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the complained of acts raise federal questions under the laws of the United States, and specifically, Fed. R. Civ. P. 60(d).

9.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that (i) there is complete diversity (Petitioners are citizens of Oregon and Sporting Goods Properties, Inc. is a Delaware corporation headquartered in Wilmington, Delaware and, (ii) the amount in controversy exceeds $75,000 (seventy five thousand dollars) exclusive of interests and costs.

10.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the fraud upon the court committed by Defendants occurred in the District of Oregon, Portland Division, and the injuries to petitioners were suffered in this district.

## BACKGROUND FACTS

### A.  The *See v. Remington* Pleadings.

11.    On September 22, 1981, Plaintiffs Teri and Darrel See filed Civil Action No. 81-886 in the District Court of Oregon against Remington Arms Company, Inc.  The Sees are hereafter referred to as "Petitioners".

12.    Petitioners were represented by attorney Peter Chamberlain.  (Exhibit 1).

13.    Petitioners sought damages for personal injuries suffered by Teri See and for loss of consortium by her husband, Darrel See.

14.    Petitioners alleged that the Remington Model 700 which seriously injured Teri See was defective and unreasonably dangerous in design and manufacture and that this

PETITION FOR RELIEF FROM JUDGMENT                                                    Page 4

dangerous design and manufacture caused Teri's injuries.[1]  Petitioners alleged that the rifle was defective and unreasonably dangerous because the rifle would fire when the safety was released without a trigger pull.  Petitioners specifically alleged the safety design required the safety to be moved to the "off safe" position before the rifle could be unloaded, and that this was one of the defects that led to Teri See's injury.  Petitioners also alleged that Remington failed to warn consumers that the rifle was susceptible to firing without a trigger pull when the safety was released.   Remington denied all of these allegations, including that it had knowledge of any defects and denied that it knew of any prior malfunctions of the Model 700 rifles.

**B.   The *See v. Remington* Discovery and Related Court Orders.**

15.     Petitioners' first Requests For Production (Exhibit 2), propounded at the opening of the case, specifically requested:

3.   All design and manufacturing drawings and specifications relating to any and all safety mechanisms used, intended for use (whether used or not), proposed for use (whether used or not), or deleted from use on defendant's Model 700 rifle.

4.   All design and manufacturing drawings and specification drawings and specifications relating to any and all trigger mechanisms used, intended for use (whether used or not), proposed for use (whether used or not), or deleted from use on defendant's Model 700 rifle.

5.   All product complaints, claims, notices, lawsuits, letters, memoranda or other information received, or generated, by defendant that claim, indicate, suggest or conclude that defendant's Model 700 rifle discharged when the safety was being disengaged.

6.   All documents which relate in any way to any recall campaigns for defendant's Model 700 rifle.

7.   All documents which relate in any way to any recall campaigns for defendant's Model 600 rifle.

---

[1]   Teri See was hospitalized for roughly twenty six (26) days and received four (4) surgeries before she could return home. Teri was severely disfigured as a result of the gunshot wound she received to both thighs.

PETITION FOR RELIEF FROM JUDGMENT                                      Page 5

8.  All documents relating to all tests performed by defendant on its Model 700 rifle.

9.  All documents relating to all test performed by defendant on its Model 600 rifle.

11. All memoranda, correspondence, reports, letters or other documents generated as part of defendant's design, manufacture, testing and/or modification of the safety mechanisms on defendant's Model 600 [*sic*] rifle.

12. All memoranda, correspondence, reports, letters or other documents generated as part of defendant's design, manufacture, testing and/or modification of the trigger mechanisms on defendant's Model 600 rifle.

(Exhibit 2).

16.   Remington offered only limited response to Petitioners' requests.  At the time Petitioners then believed this was done in good faith.  Petitioners subsequently served their second set of Requests for Production on May 10, 1982.  These requests included the following:

14. All manufacturing, Trade and governmental standards, codes or regulations with which defendant complied or attempted to comply, whether suggested, voluntary or mandatory, in and related to the design, manufacture and sale of the Remington Model 700 rifle during the period 1975 through 1981.

15. All test procedures and test results for all tests performed on the Remington Model 700 rifles which were the subject of the 49 gun examination reports produced by defendant.[2]

16. The gun examination report for defendant's examination of this rifle.

17. All tests procedures and test results for all tests performed on trigger mechanisms of the Remington Model 700 rifle in the design and manufacture of that weapon.

---

[2]Remington produced only 49 gun examination reports (GERs) to Petitioners even though hundreds were known to exist at the time of discovery in the *See* case. The GERs produced in *See* were generated by Mr. Hardy who preceded Church Prosser, an engineer responsible for conducting gun examinations on customer returned rifles complaining the rifle unintentionally discharged without trigger contact to initiate the discharge. (Exhibit 3).

PETITION FOR RELIEF FROM JUDGMENT                                    Page 6

18. All test procedures and test results for all tests performed on the safety mechanism of the Model 700 [*sic*] rifle in the design and manufacture of that weapon.

19. All letters, memoranda, notes or other correspondence which gave rise to the preparation of the 49 gun examination reports previously produced by defendant. (see footnote #2)

20. All documents in your possession relating to the lawsuits previously produced by defendant.

(Exhibit 4)

17.     Remington objected to Petitioners' First RFP's 7, 8, 9, 11 and 12 (Exhibit 5), but the Court denied the objection and ordered Remington to produce the requested documents. (Exhibit 6).

18.     Petitioners also served the following interrogatories on Defendant to which Remington answered as follows:

21. What do you contend caused this rifle to fire at the time of, and on the date of, Mrs. See's injury?

**ANSWER**:  The trigger was pulled.

24. On the date of the manufacture of the rifle, how many reports had defendant received of other Remington 700 rifles discharging when the safety was disengaged?

**ANSWER**:  Unknown.  Records that far back are no longer available due to compliance with company record retention schedules.

(Exhibit 7).

19.     On June 18, 1982 (Docket #20 in *See*) the Court ordered Defendant to comply with Petitioners' first and second requests for production, and further ordered Defendant to answer all of Petitioners ' interrogatories on or before July 6, 1982.

20.     Remington again did not comply with the Court's Order.

PETITION FOR RELIEF FROM JUDGMENT                                    Page 7

21.    After Remington failed to comply with the Court's June 18, 1982 Order, Petitioners filed a motion for sanctions against Remington.    Remington was subsequently sanctioned in August of 1982 for failure to comply with the earlier Order.[3]    (Exhibit 8).

22.    Although not known by Petitioners at the time, many relevant documents were still never produced in response to the Court's Orders.    This conduct by Remington and its attorney amounts to fraud on the Court, on the jury and on Petitioners.

**C. <u>The Fraudulent Conduct of Remington's Attorney, Robert B. Sperling.</u>**

23.    At all times relevant to this action, attorney Robert B. Sperling was litigation coordinator for Remington.    Sperling was actively involved in *See v. Remington* from the onset of the litigation, throughout discovery, and during the trial itself.    In fact, Sperling was admitted to practice in this district for the trial of the case as of February 28, 1983.    As litigation coordinator, Sperling was directly involved in and responsible for Remington's production of documents and responses to interrogatories before the trial when the Court ordered Remington to produce documents and answer interrogatories.

24.    From 1970 until 1985 attorney Sperling, as litigation coordinator, personally directed Remington's product litigation defense, including its responses to production in discovery in Model 700 cases.    He was in charge of the Model 700 rifle litigation, including the *See* case.    Sperling's own testimony on May 4, 1989, establishes his knowledge and responsibility:

> Q:  "Mr. Sperling, When did you first become involved with a Remington Model 700 case of any sort where it was alleged that the rifle had gone off without the trigger being pulled and had a defective design to market a  rifle that required you to load it and unload it with the safety in the fire position?" When did you first become involved with one of those cases?

---

[3] Remington was ordered to pay a sanction of $700 in October of 1982.

A: "Probably in the early '70s, '73 somewhere around there.

Q: Sir?

A: "'73, '72, I –I couldn't –

Q: At that point in time were you supervising or coordinating litigation dealing with that particular type of firearm?

A: At that time I was involved in all litigation concerning Remington products.

Q: Well, truthfully almost then since 1973 to the present for the last 16 years, you have been coordinating or supervising litigation involving Model 700 rifles, right?

A: Yes.

(Exhibit 28, Dep. of Sperling, p. 116, ln. 21 - p. 117 ln. 17).

Q: Mr. Sperling, what exactly is your role in the Remington firearms litigation?

A: I would get the complaint and summons as it came in and I would obtain a local counsel and would send him a summons and complaint and ask him to defend our interests in this matter… [r]eally from beginning to end.

Q: Do you participate in the discovery phase of the case?

A: I used to participate more.[4] Now I would be participating to the extent that what they were asking for was sort of my bailiwick so to speak...[5] [i]f they asked for documents that were down logistically where I was, I would try to compile those, that kind of thing.

(Exhibit 28, Dep. of Sperling, p. 65, ln. 15 - p. 66, ln. 22).[6]

---

[4] Sperling's 1989 testimony here refers to his work for Remington during the period when he handled the *See* case.

[5] "Bailiwick": a person's area of skill, knowledge, authority or work. (Webster's College Dictionary –Copyright 1996)

[6] In this case, Remington was sanctioned for improperly withholding highly probative evidence involving the Remington Operations Committee. These documents were produced almost two and a half years after they were properly requested in *Chapa*. This highly probative evidence was also requested in *See v. Remington*, however, it was never produced.

PETITION FOR RELIEF FROM JUDGMENT                                    Page 9

25.    During the pendency of *See v. Remington*, Sperling was the individual responsible for answering discovery requests on behalf of Remington.

> Q: Well, for instance you – you styled yourself I think as the litigation coordinator, is that correct?
>
> A: That's right.
>
> Q: You would then be responsible, sir, for ensuring that truthful responses were made to requests for discovery that came through Remington?
>
> A: Only to the extent that I signed a particular interrogatory answer. I used to do that when I was at Remington.[7]
>
> (Exhibit 28, Dep. of Sperling, p. 66, ln. 23 - p. 67, ln. 7).

26.    Sperling had a duty as an officer of the court to fully and truthfully respond to these properly formulated requests for production and to comply with the orders of the Court. At that time, Petitioners had no way of knowing that Sperling, or any other officer of the Court, would act in violation of their ethical obligations and court rules.

27.    Sperling had worked on as many as forty (40) other Model 700 cases by May 4, 1989 when he testified in *Chapa v. Remington*, and some of these cases obviously predated *See v. Remington*:

> Q: And most of that litigation, some 40 lawsuits or so, have involved allegations or claims that the rifle fired without the trigger being pulled sometimes during the loading or unloading process, right?
>
> A: I'm not sure of the number 40. There is certainly a number of them, but I don't know the number.
>
> Q: Well, that – the general complaint is that the rifle fired sometime during the loading or unloading process without the trigger being pulled, right?

---

[7] Sperling was employed as in-house counsel for Remington from 1970-1985, which encompasses the time period of Petitioners' original case against Remington.

PETITION FOR RELIEF FROM JUDGMENT                                    Page 10

A: Yes, there have been those complaints.

Q: And – and that's a complaint in a lawsuit that you have been dealing with now for some 15 or 16 years, right?

A: Well, there have been different lawsuits, yes.

Q: It's a complaint that you have known about for 15 or 16 years, right, sir?

A: Yes, I have.

(Exhibit 28, Dep. of Sperling, p. 117, ln. 18 - p. 118, ln. 12).

28.    Unknown to Petitioners at that time, Sperling had personal knowledge of a multitude of documents that were relevant to Petitioner's claims. Sperling was a member of the Remington Product Safety Sub-Committee (PSS Committee), a subcommittee of the Remington Operations Committee (OP Committee). The PSS Committee studied known or suspected product deficiencies and liability exposure.

29.     Sperling routinely participated in PSS Committee meetings before Petitioner was injured, sometimes acting as secretary of the meetings.  According to his testimony, he attended PSS Committee meetings in the 1970's:

Q: Do –do you have a recollection of attending some product safety subcommittee minutes?

A:  Yes

Q: You do?

A: Meetings?

Q: Yes, sir, right?

A: Right.

Q: How many do you remember attending?

A: Not a number. I just remember attending quite a few.

PETITION FOR RELIEF FROM JUDGMENT                                    Page 11

Q: You remember the product safety subcommittee minutes?

A: Yes.

Q: You remember going to the product safety subcommittee meetings back in the '70s, right?

A: Right.

Q: And now it shows us that you are at the operations committee minute – meeting where this problem of known or product safety defect was discussed, but you don't have any recollection of whatsoever, right?

A: No, I don't.

Q: So you – you remember one meeting, but you don't remember the other one. Do you ever stop and count –

A: It's not like one meeting against another. It's just a whole series of meeting of the product safety committee. I can't remember every particular meeting I attended. I remember certain ones because I took the minutes for them.

(Exhibit 28, Dep. of Sperling, p. 145, ln. 3 – p. 146, ln. 17).

30.     The OP and PSS Committees were populated by high ranking officers of Remington, and certain individuals were members of both committees.

31.     Because the PSS Committee's purpose was to identify product safety concerns, the committee reviewed customer complaints, testing failures, and requested "safety audits" to determine the potential for failures in Remington's products.  The Committee received concerns about the Model 600 and 700 rifles, both of which contained the Walker fire control design. The Committee had full authority to issue directives for corrective action including warnings and recalls.

32.    Remington's records show that Sperling had intimate knowledge of Remington's PSS and OP Committees when product safety, design, and recall of both the Model 600 and 700 rifles were discussed.

33.    As an "officer of the court," Sperling knew about the alleged defective condition of the Model 700 rifle even before Teri See's tragic injury. [8]

34.    Attorney Sperling, as supervising litigation counsel for Remington, and as an officer of the Court, participated in deliberate acts of deception and concealment of evidence for the purpose of undermining the integrity and honor of the judicial system, and has perpetrated a fraud on the court.

35. On June 30, 1982, Remington's local counsel Huegli wrote Petitioners' attorney and established that Mr. Sperling was fully aware of the Court's decision.  Sperling agreed to fully comply with the Court's Order: [9]

> On June 29 I had a telephone conference with Mr. Sperling, counsel for Remington Arms. All of the matters regarding the interrogatories and request for production will be in on time…
>
> Lastly, Bob Sperling, who is counsel for Remington Arms, is not available at all for these depositions during July 19 through July 23, as he is heavily involved in a trial in Connecticut at that time.
>
> Letter from James D. Huegli – local counsel for Remington.
>
> (Exhibit 9, Letter from James Huegli).

36.    Sperling was heavily involved with Remington's case preparation and pre-trial activities, including responding to discovery requests from Petitioners.  (Exhibit 9).

---

[8] Petitioners are attaching only a portion of the incriminating documents available.  There are thousands of additional documents proving that Remington committed a fraud on the Court.
[9] This letter was copied to Sperling so he was fully aware of the arrangement between local defense counsel and Petitioners.  (Exhibit 9).

37.    Attorney Sperling had knowledge of substantive evidence in that he acted as the secretary of Remington's Product Safety Subcommittee prior to the Teri See's injury and trial.

38.    The attached Product Safety Subcommittee report of January 2, 1979 discussed the testing and recall of the Model 600 and 700 rifles.  (Exhibit 10.)

39.    Exhibit 10 contains information clearly responsive to Petitioners' RFP's 7, 8, 9, 11, and 12 described above, and this document would have disproved Remington's claimed defenses.  This document described testing procedures related to both the Model 600 and 700 rifles, results of those tests, the recall of the Model 600 but not the Model 700 rifles, and the propensity of Model 600 and 700 rifles to fire without a trigger pull.  Failure to produce this document is an example of fraud on the Court by Sperling and Remington.

40.    The Product Safety Subcommittee meeting report (Exhibit 10) was also responsive to Interrogatories 14 and 24 propounded by Petitioners.  This report shows Remington's prior knowledge that literally thousands of Model 700 rifles then sold could fire without a trigger pull.  Despite this knowledge, Remington steadfastly claimed this was not possible of the See rifle.  Prior to the *See* trial, Remington also claimed its document retention policy prevented it from producing customer complaints about Model 600 and Model 700 rifles.  The Product Safety Subcommittee document authored by Sperling clearly discusses such complaints, and proves that Remington's claim about its document retention policy was false.

41.    Despite Petitioners' requests for this type of document, and even though Remington was ordered to produce responsive documents, the report was never produced by Remington in *See v. Remington*.

42.    In March of 1975, Sperling attended an operations committee meeting where "known or suspected product deficiencies" in the bolt action rifle models were discussed.  The

PETITION FOR RELIEF FROM JUDGMENT                                         Page 14

committee concluded, "Ease of operation and safe gun handling demand a design that enables the shooter to operate the action with the safety on.[10]"   This is particularly relevant to Petitioners' claims because the pre-1982 Remington Model 600 and 700 are bolt action rifles which could not be unloaded unless the safety was first placed in the "off" position as alleged in Petitioners' original complaint.  (Exhibit 11).

43.    Exhibit 11, minutes of the March 1975 meeting, was never produced.

44.    One year later, March 18, 1976, the Remington OP Committee generated committee minutes maintaining exactly the same position as they had during the 1975 meeting. (Exhibit 12).  These committee minutes should have been provided in response to a number of Petitioners' Requests for Production in *See*.

45.    The March 1976 minutes were never produced.

46.    On November 6, 1978, Sperling authored a letter to the finance department of DuPont, including the following admissions:

> Remington first became aware in 1975 that the safety selector and the trigger on the Mohawk 600 could be manipulated in such a way that subsequently moving the safety selector to the fire position could result in accidental discharge.
>
> Remington had no other choice, regardless of our beliefs as to the cause of the Coates accident, but to recall the Mohawk 600, and other models having the same trigger assembly …
>
> (Exhibit 13).

This letter discusses the recall of the Remington Model 600 rifle and other models with similar fire controls.  This is the type of Model 600 document ordered to be produced by the Court in *See v. Remington*.  The 1978 letter authored by Sperling was never identified as privileged.  Because the Walker fire control design was used in both the Model 600 and Model

---

[10] At this time it was recommended to add a three (3) position safety to permit unloading of a Model 700 rifle to prevent FSR malfunctions.

700 rifles, Remington's knowledge that these rifles would fire without a trigger pull would have been crucial for Petitioners' jury presentation.

47.     The 1978 letter authored by Sperling was never produced.

48.     From 1981 to 1983, Petitioners requested information about the 1978 recall of the Model 600 rifle.  Petitioners contended during discovery that, "Defendant's Model 600 has substantially the same history of defects [malfunctions] and that there is discoverable material in the documents requested concerning the Model 600 which is relevant and applicable to the alleged defects of the Model 700 rifle."(*See* Docket 12)  On May 3, 1983, the Court allowed discovery involving the Model 600.

49.      In 1975, a Texas gun owner reported a malfunctioning Model 600 to Remington. When the rifle was returned to Remington for examination, the malfunction was duplicated, i.e. it fired on safety release when the trigger and safety were operated in a certain sequence.  At this point, Remington began to collect information from internal Gallery testing, Gunsmith Call Reports, and Arms Service usage Reports: (Exhibit 14).  Petitioners requested this type of document during discovery.

50.     Again, despite the Court's orders requiring Remington to produce, it withheld most incriminating documents, including one stating:

> The Gunsmith Call Reports date back to 1970. In these reports we
> find one (1) Model 600, two (2) Model 788, and thirteen (13)
> Model 700's with some sort or another of justified or unjustified
> malfunctions. The one that is most concerning is Fred Woodrick's
> Call Report…I personally called Malcolm Cross to confirm that he
> did encounter six (6) Model 700's that were malfunctioning. He
> did verify it was the Model 700,… He stated that it was because
> there was not enough clearance between the sear and connector."
> We are attaching, also, a copy of the Model 700 Safety Function
> Test Preliminary Survey as of May 19th."[11]  (Exhibit 14).

---

[11] May 20, 1975 memo; Bolt Action Rifle Safeties, attached as Exhibit 14.

51.     Remington and Sperling intentionally concealed this and many other relevant documents when they responded to Petitioners' Interrogatory No. 24 by claiming they had "no records" dating before Petitioners' Model 700 was manufactured:

> 24. On the date of the manufacture of the rifle, how many reports had defendant received of other Remington 700 rifles discharging when the safety was disengaged?
>
> ANSWER:   Unknown.   <u>Records that far back are no longer available due to compliance with company record retention schedules</u>.

52.     According to Remington, the rifle that caused the injuries in *See v. Remington* was manufactured in 1976.   Remington eventually produced only forty nine (49) Gun Examination Reports (GER's) in response to Petitioners' Request for Production.   However, the attached Exhibit 15 contains almost 150 GER's (mostly Model 700's) that predate the 49 GER's produced to Petitioners.[13]

53.     At a minimum, 101 GER's were not produced.

54.     In addition, the log of relevant Model 700 Customer Complaints attached as Exhibit 16, contains over 300 complaints received by Remington between 1970 and 1983.

55.     These complaints existed before Petitioners' trial and were, yet again, improperly concealed.

56.     Attached as Exhibit 17 are raw data results from Remington's Gallery Testing described in paragraph 50 above as "Safety malfunction found in our gallery on new rifles." Between the years 1970 – 1974, under the heading "<u>Number of Justified Complaints</u>," Remington referred to the Model 700 as being the "<u>Worse Case Problem</u>." This is identified under the malfunction code "109" which represents "Fires when safe is pushed off."

---

[13] The GERs attached were first disclosed in March 1995 in the *Aleksich v. Remington* case in Montana. This proves Remington had maintained the files all along.

57.     These documents were also not produced to Petitioners.

58.     Through 1975, Remington conducted other extensive "audits" to determine the scope of safety hazards and liability resulting from safety-related malfunctions in the Model 600 and Model 700 rifles. This included the "FSR" condition that Petitioners alleged was the primary cause of Teri See's injuries.  Attached as Exhibit 18 is a May 2, 1975 Gallery report showing "safety malfunctions" occurring in both the Models 600 and 700 rifles. These records existed and were requested by Petitioners, but were not produced.

59.     Sperling had personal knowledge of these audits and reports.  In June 23, 1975, he authored Product Safety Committee Minutes which admitted: "The recent audit indicates the new procedure instituted by the plant have eliminated the "trick" safety condition on all bolt action guns." [14]   The memo also indicates proposals "to improve bolt action fire controls were accepted by the committee." (Exhibit 19).   All of this was intentionally withheld from the Court by Sperling despite the Court's orders to produce.

60.     Petitioners' complaint also alleged that "Defendant designed this rifle such that lubrication of the trigger assembly could result in the rifle unexpectedly firing when the safety was moved from the "on safe" position to the "fire" position despite the fact that the trigger was not being pulled at the time.  (Pretrial Order, Plaintiffs' contention (g) (4), Page 5, attached as Exhibit 20).   Remington knew that lubrication of the trigger assembly could cause the rifles to fire without a trigger pull, according to several documents concealed by Sperling.

61.     These documents were not produced to Petitioners.

/ / /

/ / /

---

[14] The "Trick" safety condition was revealed by a special test Remington developed to determine if an M/600 or M/700 is capable of FSR.

62.    For example, a memo dated October 3, 1980 entitled "Gummed Triggers" was sent to Sperling.  The memo states;

> Please see the attached from John Linde and Jack Chisnall[15], relative to lubricants gumming up trigger mechanism, resulting in a safety problem.  One of these relates to WD40, but I have also heard that the protective coating we use (Steel Guard) will also gum up in time, and freeze trigger components.  My question is, should this be investigated more fully, and do we properly warn in our instruction manual?

63.    Another memo, dated October 13, 1980, was a response to the earlier October 3, 1980 memo.  The later memo states: "I have referred this to R. Capelette's Group for action.  To answer Larson's question, (1) we must investigate this more fully, (2) we do not warn about improper cleaning or improper lubrication of the fire control in our manual." These memos were not produced despite the Court's orders.

64.    Neither of the memos discussed in paragraphs 62 and 63 were produced to Petitioners.

65.    Remington undertook an extensive lubrication evaluation; and on June 30, 1982, Evan Ritchie, Sr. Supervisor of the Illion Firearms Research Testing & Measurement Lab, reported on the results of the Model 700 fire control lubrication testing.  Ritchie stated, "It is clear we have a problem in firearms due to improper cleaning and lubricating.  This is evident by the visible signs of film and gum buildup on returned customer firearms, customer complaints in the field and product liability cases in this area.  To improve this situation, the owners' manual can be rewritten to include a more detailed description on 'How to properly clean and lubricate

---

[15] Jack Chisnall was one of Remington's primary defense witness' in *See*

the firearm.'"  (Exhibit 21, Page 1).  The presentation noted that "legal" will be contacted for

their input and final approval during the rewriting.[16]  (Exhibit 21, Page 6).

66.    Again, none of these documents were produced by Remington.

**D.  Remington's Strategy of Fraudulent Concealment and Resulting Sanctions in Other Cases.**

67.    Petitioners now know that attorney Sperling was advancing Remington's scheme

to deceive the Courts, plaintiffs, and the public by hiding the dangerous defects in the Model 700

rifles.  This strategy to defraud the courts by deliberately concealing relevant and damaging

information has continued for years as shown by a history of sanctions. (Exhibit 22)[17]

68.    Another example of Remington's fraud on the Court in *See v. Remington* was its

intentional concealment of documents showing Remington's alternative fire control and safety

design development.[18]  With then-mounting litigation against Remington, alternative design

programs were described in company records as "intended to put us [Remington] in a more

secure position with respect to product liability." (Exhibit 23).  None of these records were

produced to Petitioners.

69.    According to a 1980-1981 Remington Firearms Research Division memo, the

company deemed alternative design to be a "necessity" for improvement in the areas of bolt lock

and fire controls development on their bolt action rifle product lines. It also states that

Remington's motive for alternate design was, "Necessary to reduce product liability."  (Exhibit

24).  Neither of these records were produced to Petitioners.

---

[16] "Legal" would have included Robert Sperling admitted to practice as an officer of the court in *See*.
[17] In the interest of efficiency, Petitioners have only included three examples of sanctions imposed upon Remington.  There are many more.
[18] *See* Production Requests (3) and (4) from *See v. Remington*.

70.    In the later *Chapa* case, Remington's "new bolt action rifle" (NBAR) program documents were apparently discovered by accident:

> After Remington mistakenly provided minutes of its Firearm Business Team dated May 31, 1985 describing the <u>ongoing</u> research into a New Bolt Action Rifle (NBAR) as a "<u>replacement for the Model 700,</u>"Chapa demanded production of materials relating to the NBAR program under previous discovery requests for alternative design and replacement information. When Remington refused, Chapa served notices of depositions accompanied by subpoenas duces tecum requesting specific NBAR materials and <u>filed a motion to compel production based on earlier requests together with a motion for sanctions for discovery abuse.</u>
> *Chapa v. Garcia, 848 S.W.2d 669 (Tex. 1992)*
>
> (underlining added)
>
> (Exhibit 25).

71.     Although they existed before Petitioners' trial, the alternative fire control and safety design development documents were never produced to Petitioners.  The quote below from *Chapa* shows that Remington had alternative design development programs underway well before the Petitioners' 1983 trial:

> Chapa repeatedly sought to determine any Remington attempt to prevent misfiring [firing on safety release] through improvements in the design of this system. Among this discovery were requests for production of documents "<u>relating to any design studies concerning alternate design for the safety system or trigger assembly mechanism</u>" and those "<u>regarding the replacement of any of the fire control system with a different design</u>" for certain identified models.[19]
>
> The only discovery produced, however, was limited both as to scope –<u>research directed specifically to improvement of the Model 700</u> –and as to time –<u>only through 1981.</u>
> *Chapa v. Garcia,* 848 S.W.2d 667, 668-669 (Tex. 1992)
>
> (underlining added)
>
> (Exhibit 25).

---

[19] The *Chapa* requests should be compared to the *See* RFP (3); (4)

### E.  **The Verdict for Remington.**

72.    Petitioners' case was heard by a jury in March, 1983, and the jury returned a verdict in favor of Remington. Petitioners believe the verdict for Remington was caused primarily or at least in large part by Remington's deliberate fraud on the Court through attorney and officer of the Court, Robert Sperling, to-wit:  its failure to produce documents proving that it knew of the propensity for the Model 700 to malfunction in the manner in which the See rifle malfunctioned causing injury to Teri See.   It is impossible to fully realize the effects of Sperling's fraud on the Court.  In any event, Remington should not be permitted to benefit from this fraud.

### F.  **Petitioners' Recent Discovery of Remington's Fraud.**

73.    Petitioners only recently became aware of Remington's fraud in their case.   In 2012, Petitioners first learned that Remington withheld evidence from them and defrauded the Court.  This Petition is timely filed considering that the fraud perpetrated by Sperling and Remington was not discoverable by the general public until late 2012, as seen in the following paragraphs.

74.    In  *Aleksich v. Remington Arms Co., et al.*, No. 2:91-cv-00005-RFC (D. Mont. Feb. 6, 2012), a new Remington management group first produced thousands of documents relating to testing, customer complaints, recall of the Model 600, and discussions about recalling the Model 700 rifles. These documents existed before the *See* trial. (Exhibit 26, Plaintiff's Motion for Sanctions: Exhibit C – The New Documents, and Exhibit 27, Document Exhibit list).

75.    Most of the previously-concealed documents produced by Remington in *Aleksich* in 1995 were considered protected by court orders or believed to be protected until

approximately September of 2012. Petitioners could not have seen them until they were unsealed at that time.

76.     As seen above, many of these documents never produced in *See* were finally produced by Remington in *Aleksich*. Many were either authored by Sperling or show that he received them and were in existence before Petitioners' trial. Even as to those documents that did not specifically name Sperling, as litigation coordinator for Remington, he would have had knowledge of them. These documents were concealed by Sperling and Remington to defraud the Court and the jury, and Petitioners.

77.     The documents described above, and many others that were available to Sperling and Remington before Petitioners' trial, would have disproved Remington's steadfast claims of no defect, no "known or suspected" product deficiencies, no knowledge of defects, no duty to warn consumers, and that the Model 700 could not fire without a trigger pull.

78.     Remington's fraudulent concealment of these documents has undermined the civil justice system by intentionally and deliberately deceiving the Court, the jury, and Petitioners.

79.     In direct contravention to controlling Ninth Circuit law[20], the intentional concealment of numerous documents by Sperling as described throughout this Petition was a calculated attempt to subvert the integrity of the court and the described fraud was committed by Sperling as an officer of the Court.

80.     As described above, Sperling and Remington were involved in an unconscionable plan or scheme which was designed to improperly influence the court and the jury in its decision.

81.     Attached in support of this Petition is the affidavit of Petitioners' original trial counsel, Peter Chamberlain.

---

[20] *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128 (9th Cir. 1995)

WHEREFORE, for the reasons stated above, Petitioners pray that this Court provide relief from the judgment rendered in Civil Action No. 81-866 by reopening the case for a new trial.    Petitioners also request that the Court impose appropriate sanctions considering Remington's conduct and the costs to Petitioners.  Sanctions should include a default judgment, the striking of Remington's pleadings, an award of costs, fees and other sanctions deemed reasonable under the newly discovered circumstances of this case.

DATED: October 4, 2013.

HITT HILLER MONFILS WILLIAMS LLP

By:    /s/  James L. Hiller
James L. Hiller, OSB #772220
Of Attorneys for Petitioners